## Philadelphia Tax Review Board, Appellant, *v.* Norton, Lilly & Co.

Argued November 24, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

reargument refused January 25, 1960.

*Alan Miles Ruben,* Deputy to the City Solicitor, with him *James L. J. Pié* and *Leonard B. Rosenthal,* Assistant City Solicitors, and *David Berger,* City Solicitor, for City of Philadelphia, appellant.

*George M. Brodhead,* with him *John F. Kennedy, J. Welles Henderson,* and *Rawle & Henderson,* for appellee.

OPINION BY MR. JUSTICE BOK, December 31, 1959:

The Philadelphia Tax Review Board upheld the City's attempt to assess its Mercantile License Tax against respondent for the years 1953 through 1956. The Court of Common Pleas affirmed, but the Superior Court held that the tax lay upon interstate and foreign commerce, and reversed. We have accepted the case on allocatur.

It is agreed that the tax is an excise tax on gross receipts.

Respondent is a partnership none of whose eight members lives in Philadephia. It acts as general steamship agent for eight lines that sail in foreign commerce. It has an office in the City, with fourteen

to eighteen employes who are paid from its main office in New York City. It has a bank account and a telephone listing in Philadelphia but no other assets than its office equipment. What it does as agent for the lines is best described by its witness Peters:

"Q. You say you are engaged by these steamship lines, you have an agreement with them of some kind? A. Yes. Q. In general, that agreement provides for what? A. Normally to get the ship in as quick as we can, to load it and arrange for all the necessary services and get it out again. Q. Will you break that up into specific things you do in order to accomplish that, in the first place the steamship company notifies you a particular ship is coming into Philadelphia at a particular time? A. We know when the vessel sails from Calcutta. Q. Do they tell you about how much cargo there is? A. Yes, and by the time the ship gets here, we have the papers before that. . . . We would get a radio twenty-four hours before the ship arrives. We would know when the ship gets to the mouth of the river and then we arrange for the pilot to go aboard, we have made arrangements for the berthing and we arrange for the stevedores to load and unload, we tell the stevedores what the capacity, what hatches to work in and how many hours and where the cargo is stored. Q. Do you actually employ the stevedore company . . .? A. The steamship lines have contracts with stevedoring concerns, contracts of employment, not we. Q. What you do is notify the various persons who have contracts with the steamship lines that a certain vessel . . . is coming and tell them what is involved? A. That's correct, and in principal how to perform their operations. Q. In other words, it is your responsibility to indicate what they should do to have the vessel unloaded within the time and in proper fashion? A. Yes, that's correct. . . . Q. You supervise . . . from the office? A. That's right. Q. What do you do? A. Tell

them in what hatches to place the cargo, time to be in at work, for instance, at eight o'clock and if there is overtime. Q. Who do you tell that to? A. The stevedoring foreman or the contractor. Q. By telephone? A. Yes."

The witness added that respondent also solicits outbound freight; that after handling a ship it collects the freight money, pays the bills, deducts its fee, and remits the balance to its principal; and that on an outbound shipment the procedure is the reverse of that for an inbound shipment.

We think that the Tax Review Board ignored this evidence or failed to see its significance when it said: "The petitioner does not employ, direct or control the persons who pilot, berth, load or unload the vessels." Reading the Board's opinion as a whole, we do not regard this statement as a finding of fact (its Finding No. 3 is to like effect) that it disbelieved Peters's uncontradicted testimony. There is no evidence, be it also said, that respondent directed the pilot or the tugs or the wharfmaster.

From the quoted evidence it is at once apparent that respondent retained control of the stevedoring and even took part in it. It told the foreman of the stevedores not only what to do but "how to perform their operations." See *Mature v. Angelo,* 373 Pa. 593 (1953), 97 A. 2d 59. To telephone him from an office is the same, in this modern age, as standing on the bridge of the vessel and shouting the same instructions through a megaphone.

This brings the case squarely within *Puget Sound Stevedoring Co. v. Tax Commission of the State of Washington,* 302 U.S. 90 (1937), 58 S. Ct. 72. Mr. Justice CARDOZO said: "The business of appellant, in so far as it consists of the loading and discharge of cargoes by longshoremen subject to its own direction and control, is interstate or foreign commerce. . . .

"The business of appellant, in so far as it consists of supplying longshoremen to ship-owners or masters without directing or controlling the work of loading or unloading, is not interstate or foreign commerce but rather a local business, and subject, like such business generally, to taxation by the state."

In *Joseph v. Carter & Weekes Stevedoring Co.*, 330 U.S. 422 (1947), 67 S. Ct. 815, Mr. Justice REED said: "Stevedoring, we conclude, is essentially a part of the commerce itself and therefore a tax upon its gross receipts or upon the privilege of conducting the business of stevedoring for interstate and foreign commerce, measured by those gross receipts, is invalid. We reaffirm the rule of Puget Sound Stevedoring Company." He added: "We do not think that a tax on gross income from stevedoring, obviously, a 'continuation of the transportation,' is a tax apportioned to income derived from activities within the taxing State. The transportation in commerce, at the least, begins with loading and ends with unloading. Loading and unloading has effect on transportation outside the taxing state because those activities are not only preliminary to but are an essential part of the safety and convenience of the transportation itself."

It follows that the Mercantile License Tax would be invalid to the extent that it was allocated to gross receipts from stevedoring over which respondent exercised control and direction. The evidence reveals no stevedoring hired by respondent without the exercise of control and direction.

We take the case as we find it. If the other services were merely hired and not controlled by defendants so as to suggest their character as purely shore-side and taxable, no effort has been made to distinguish them. Since the Tax Board and the City have treated these services as being in the same class as stevedoring, we will not be industrious to find a new theory for the

case. The only distinction made by the City is to divide the defendant's receipts between those originating from business done in the City and those originating from business done outside of it.

The judgment of the Superior Court is affirmed.

Mr. Justice McBRIDE dissents.